[Cite as *State v. Holt*, 2010-Ohio-2298.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,           CASE NO. 9-09-39

    v.

GEORGE T. HOLT,                  **O P I N I O N**

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 09-CR-081

**Judgment Affirmed**

**Date of Decision:  May 24, 2010**

**APPEARANCES:**

    *Kevin P. Collins*  for Appellant

    *Brent Yager and Gregory A. Perry*  for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, George T. Holt, appeals the September 16, 2009 judgment of the Common Pleas Court of Marion County, Ohio, finding him guilty of possession of heroin with a firearm specification, having weapons while under disability, and tampering with evidence and sentencing him to nine years in prison.

{¶2} The facts relevant to this appeal are as follows. On the afternoon of February 23, 2009, detectives with the MARMET Drug Task Force ("the task force") in Marion County, Ohio, received an anonymous tip that Holt was in Columbus, purchasing heroin, and that he would be returning to Marion later that day with the heroin. The tipster also reported that Holt was driving a white Oldsmobile Bravada. Shortly thereafter, the task force began conducting surveillance around the area of 492 Silver Street, Holt's residence. Members of the task force had previously received information that Holt was selling drugs and were familiar with his address.

{¶3} After watching the area for approximately 1½ -2 hours and not seeing the Bravada or any activity at the house, the task force decided to terminate its surveillance. As officers were leaving, Detective Ryan Ward saw a black Oldsmobile Bravada, occupied by two white males, turn onto Silver Street. He then radioed this information to the other detectives. Although Det. Ward did not

know Holt at the time, he met Holt later that evening and realized that Holt was the driver of this vehicle.

**{¶4}** Detective Dan Ice, who was leaving the surveillance at that time, heard the information about the Bravada and circled back to 492 Silver Street. Upon arriving back at the home, Det. Ice noticed a black Bravada parked in the yard, but it was unoccupied. Surveillance was then re-established.

**{¶5}** Det. Rob Musser began watching the house again. This time he noticed people moving inside of the house and that the lights were on. While he was watching the home, a woman in a red, four-door-vehicle parked in front of the home, and she and a child entered the residence. A few minutes later, a man walked across Silver Street and entered the house. A short while later, a man exited the house and began walking westbound on Silver Street. Det. Musser transmitted this information over the radio to the other officers and continued to watch the home. Within minutes, the female driver of the red car also left the home, driving eastbound on Silver Street. Det. Musser radioed this information to the other officers as well. At that point, the officers decided that Detectives Ice and Ward would follow the car, and Det. Musser would assist Detective Mark Elliott, who was already attempting to locate the pedestrian.

**{¶6}** Det. Elliott saw the male subject jog past the parking lot in which he was located. He recognized the man as Jason Smith, who he had arrested for

disorderly conduct a couple of weeks before that. As Smith passed him, Det. Elliott said, "Hey, Jason," and Smith walked over to him. Det. Elliott identified himself and asked Smith where he was coming from. Smith told him he had been at Holt's house. Det. Elliott then asked where he was headed, and Smith initially told him that he was going to his girlfriend's home. Smith also told Det. Elliott that he had been with Holt that day and that the two had travelled to Columbus.

{¶7} At some point in the conversation, Det. Elliott informed Smith that it was not an accident that he was in the area, that the task force had information, that they knew what Holt and Smith were doing in Columbus, and asked Smith about his trip to Columbus with Holt. Smith told Det. Elliott that Holt had taken $800 to Columbus with them and used that money to purchase heroin. Det. Elliott then asked Smith for permission to search his person, and Smith granted him permission. By this time, Det. Musser had arrived at their location.

{¶8} Prior to searching Smith, Det. Elliott asked Smith if he had anything on him, and Smith indicated that he did not. However, Det. Elliott further asked if Smith had anything on his person that might poke or stick him, and Smith told him that he did and "to wait a minute" because he had a needle in his pocket. Det. Elliott had Smith remove the needle from his pocket and place it on the bumper of Det. Elliott's vehicle. In the right front watch pocket of Smith's pants, Det. Elliott found five balloons containing heroin. Smith then told the detectives that he was

making a drug delivery for Holt to a person named "Scuba Steve," who was supposed to be in a tan truck on Toledo Avenue. At that time, Smith and the detectives were near the intersection of Silver Street and Toledo Avenue. He also told them that Holt had given one balloon of heroin to the woman in the red vehicle and that Holt had more heroin at the house but that he did not know the exact quantity.

{¶9} While Detectives Elliott and Musser were with Smith, Detectives Ward and Ice followed the red vehicle. Detective Ward, who was the closest to the red vehicle, saw the driver turn right without using her turn signal 100 feet before the intersection and cross three lanes of traffic before turning on to another street. The red vehicle then failed to stop for a red light. Det. Ward initiated a traffic stop of the red vehicle and learned the driver's name was Tracy Sanchez.

{¶10} After briefly speaking with Sanchez, Det. Ward asked her if he could search her vehicle and her person. Sanchez gave him permission, and when asked if she had any drugs or contraband in her vehicle, she said that she did not. However, Det. Ward found a balloon of heroin in a cigarette pack in the center console. Initially, Sanchez denied knowing anything about the heroin, but when questioned further, she informed the detectives that she received the heroin from Holt as payment for babysitting his children.

{¶11} Shortly after finding the heroin in Sanchez's vehicle, Det. Ice received a call from Det. Musser, who was with Smith. Det. Musser told Det. Ice that he had Smith stopped and that Smith informed him that Holt had given a balloon of heroin to the woman in the red vehicle (Sanchez). Det. Ice advised Det. Musser that they had already located the heroin in Sanchez's car. At that point, the detectives believed they had probable cause to search Holt's home and decided to attempt to obtain a search warrant. To facilitate this, Det. Ice returned to the police department to type the affidavit and warrant and to contact a judge to sign the warrant. Smith was transported to the Marion Police Department, and Sanchez was allowed to pick up her children. After picking up her children, Sanchez also went to the police department.

{¶12} During their conversation with Smith, Detectives Musser and Elliott noticed that he appeared to be very nervous. When asked why, Smith stated that he was worried that Holt would know something was wrong and that the police were involved. Smith explained that he did not want to be on the street with them where they might be seen. He also worried that Scuba Steve would call Holt to ask where his heroin was, tipping Holt off about the police, or that Smith's girlfriend would call Holt to find out where Smith was because she was expecting him soon, also tipping Holt off about the police.

{¶13} Based on Smith's apprehensiveness, the detective began to fear that Holt would suspect the police were on to him and dispose of or destroy whatever heroin remained in his possession. As a result, Det. Musser contacted his superior, Lieutenant B.J. Gruber, at his home to ask him how to proceed. Lt. Gruber told Det. Musser to sit on the house until he arrived. While watching the home and waiting for Lt. Gruber, Det. Musser called Brent Yager, the Marion County prosecutor, to get his legal advice about their options. After informing Yager of the situation and of his concerns regarding the disposal/destruction of the heroin, Yager advised him that they could knock on the door and, if someone answered the door, they could make entry to secure the residence. However, Yager advised him that they could not search the home until they obtained a warrant.

{¶14} Shortly thereafter, Lt. Gruber and Det. Ward arrived at 492 Silver and briefly discussed entering the home with Det. Musser. The three men then approached the residence. All three were in plain clothes. However, Det. Ward was wearing his police vest with the word "Sheriff" written on it, and the other two had their badges displayed on chains around their necks. Det. Musser knocked on the door, and a man named Josh Townsend opened the door. Det. Musser announced, "Police department," and he and Lt. Gruber entered the home with their weapons drawn.

{¶15} Upon entering, Lt. Gruber secured the living room, where Townsend, Lyndee Anderson, who was Holt's girlfriend, and a child were located. He secured this area by yelling, "Police, get down," and the people in that room immediately complied. Det. Musser and Det. Ward continued into the kitchen, where they found Holt standing, holding a small child and a carton of eggs. Det. Musser told him, "Police, show me your hands," and Holt began backing away. Holt set the child down, dropped the eggs, and grabbed the back doorknob. Det. Musser attempted to grab Holt's arm, but he was able to break free and run out the back door. Det. Musser and Det. Ward ran after him, yelling, "Police, stop." Lt. Gruber then called for immediate assistance because he was the sole officer in the house with two unknown adults and several rooms of the house that had not been checked for additional people.

{¶16} While chasing Holt, Det. Ward saw him reach into his left pocket and throw something as he ran past a metal shed. Det. Ward heard the object hit the shed. Once in the alley behind the home, Holt lost his footing and tripped. The detectives were able to apprehend him and give him to a uniformed officer who had arrived at the scene. This officer then placed Holt in a marked patrol car.

{¶17} After securing Holt, the detectives returned to the metal shed and began looking for whatever Holt had thrown, as well as Det. Musser's radio, which he had lost during the chase. A few feet from the shed, the detectives found

a cellophane bag, containing 46 balloons with a substance they suspected was heroin inside the balloons. This bag was seized by the detectives, and they returned to the home to assist Lt. Gruber in securing the house until the warrant arrived. A laboratory analysis later revealed that the balloons contained 5.5 grams of heroin.

{¶18} While Det. Musser and Det. Ward were chasing Holt, Lt. Gruber remained in the home with his back to the open front door. Before the other detectives returned, a man, later identified as Randy Cranston, entered the home, tapped Lt. Gruber on the shoulder, and said, "Dude, the cops are coming." Lt. Gruber turned around, displaying his badge and gun, and told Cranston, "I am the police, get down." Cranston complied.

{¶19} At 8:40 p.m., the warrant was signed by a judge and brought to the house. Once the warrant was obtained, the detectives began searching the home. During this search, a Ruger P95 9mm pistol was found inside a leather coat. The gun was loaded with a magazine, and another magazine was found in the coat. The officers also found several needles, a burnt spoon, charboy, and a pocket knife in the bathroom.

{¶20} The following day, Holt was interviewed by Det. Christy Utley of the task force. During this interview, Holt admitted that the pistol belonged to him and that he purchased it the day before for $80.

{¶21} On March 5, 2009, Holt was indicted by the grand jury on six counts: Count One-possession of heroin in violation of "R.C. 2925.11(C)(6)(b)",[1] a felony of the third degree; Count Two-trafficking in heroin in violation of R.C. 2925.03(A)(2), a felony of the second degree; Counts Three and Four-trafficking in heroin in violation of R.C. 2925.03(C)(6)(b), both felonies of the fourth degree; Count Five-having weapons while under disability in violation of R.C. 2923.13(A)(1), a felony of the third degree; and Count Six-tampering with evidence in violation of R.C. 2921.12(A), a felony of the third degree. Counts One through Four also contained a one-year firearm specification. Holt pled not guilty to each count and specification.

{¶22} Holt filed a motion to suppress the evidence obtained during the February 23, 2009 search of his home. This matter was heard by the trial court on June 8, 2009, and June 15, 2009. At the conclusion of that hearing, the trial court overruled the motion to suppress.

{¶23} The matter proceeded to a jury trial on June 30, 2009, and July 1, 2009. After the jury was seated but prior to the presentation of opening statements, the State made a motion to dismiss Counts Two, Three, and Four,

---

[1] While the indictment and subsequent bill of information state R.C. 2925.11(C)(6)(b) was the section under which Holt was charged, the language used in the body of Count One, particularly in regards to the weight of the heroin, is that of R.C. 2925.11(A), (C)(6)(c). The trial court also instructed the jury in regards to R.C.2925.11(A), (C)(6)(c). Thus, such error in identifying the proper numerical designation does not affect the validity of the conviction because Holt was not prejudicially misled by this error. See Crim.R. 7(B).

which was granted. The State also made a motion to amend Count Five of the indictment to reflect the proper statutory subsection from R.C. 2923.13(A)(1) to R.C. 2923.13(A)(2), noting that the language of the indictment accurately stated the elements but that the sub-section was a typographical error. This amendment was also permitted.

{¶24} After the presentation of the State's case, Holt made a motion for acquittal, which was denied. Thereafter, Holt did not present any evidence on his own behalf and renewed his motion for acquittal. This motion was again denied, and the three remaining counts and firearm specification were submitted to the jury. The jury returned verdicts of guilty on each count and specification.

{¶25} On September 8, 2009, Holt was sentenced to four years in prison on Count One, two years in prison on Count Five, two years in prison on Count Six, and a mandatory one-year prison term for the firearm specification. The court further ordered that these be served consecutively for an aggregate prison term of nine years. Holt was returned to court on September 14, 2009, to be advised of his right to appeal, which the trial court realized it had neglected to do at the sentencing hearing on the 8th. This appeal followed, and Holt now asserts seven assignments of error.

## ASSIGNMENT OF ERROR I:

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY DENYING HIS MOTION TO**

**SUPPRESS EVIDENCE OBTAINED AS THE RESULT OF A WARRANTLESS SEARCH.**

**ASSIGNMENT OF ERROR II:**

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR HAVING A WEAPON UNDER DISABILITY.**

**ASSIGNMENT OF ERROR III:**

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR FIREARM SPECIFICATIONS.**

**ASSIGNMENT OF ERROR IV:**

**DEFENDANT-APPELLANT'S CONVICTION FOR FIREARM SPECIFICATION IS AGAINST MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR V:**

**DEFENDANT-APPELLANT'S CONVICTION FOR TAMPERING WITH EVIDENCE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR VI:**

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR A THIRD DEGREE FELONY POSSESSION OF HEROIN.**

**ASSIGNMENT OF ERROR VII:**

**DEFENDANT-APPELLANT'S SENTENCE IS EXCESSIVE AND CONTRARY TO LAW.**

*First Assignment of Error*

**{¶26}** In his first assignment of error, Holt contends that the trial court erred in overruling his motion to suppress the evidence obtained as a result of the warrantless entry and subsequent search of his home.  Specifically, Holt maintains that the task force unreasonably entered his home without first obtaining a warrant supported by probable cause thereby violating his Fourth and Fourteenth Amendment rights.

**{¶27}** Our review of this issue begins by noting that appellate review of a decision on a motion to suppress evidence presents a mixed question of law and fact.  *State v. Bressler*, 3rd Dist. No. 15-05-13, 2006-Ohio-611.

> **At a suppression hearing, the trial court assumes the role of trier of fact and is in the best position to resolve factual questions and evaluate the credibility of witnesses.  *State v. Carter*, 72 Ohio St.3d 545, 552, 651 N.E.2d 965, 1995-Ohio-104.  When reviewing a trial court's decision on a motion to suppress, an appellate court must uphold the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Dunlap*, 73 Ohio St .3d 308, 314, 652 N.E.2d 988, 1995-Ohio-243.  We must defer to "the trial court's findings of fact and rely on its ability to evaluate the credibility of the witnesses," and then independently review whether the trial court applied the correct legal standard.  *State v. Anderson* (1995), 100 Ohio App.3d 688, 691, 654 N.E.2d 1034.**

*Bressler*, 2006-Ohio-611, at ¶ 10.

**{¶28}** The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee "[t]he right of the people

to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures." Accordingly, the State is prohibited from making unreasonable intrusions into areas where people have legitimate expectations of privacy without a search warrant. *United States v. Chadwick* (1977), 433 U.S. 1, 7, 97 S.Ct. 2476, overruled on other grounds in *California v. Acevedo* (1991), 500 U.S. 565, 111 S.Ct. 1982. Thus, absent exigent circumstances, a warrantless search or seizure in a home is per se unreasonable. *Payton v. New York* (1980), 445 U.S. 573, 590, 100 S.Ct. 1371. In addition, when trying to prove a Fourth Amendment exception exists, the State bears the burden of proof in order to survive a motion to suppress. *State v. Kessler* (1978), 53 Ohio St.2d 204, 207, 373 N.E.2d 1252.

{¶29} One exigent circumstance which will justify a warrantless search and seizure arises "when there is imminent danger that evidence will be lost or destroyed if a search is not immediately conducted." *State v. Moore*, 90 Ohio St.3d 47, 52, 734 N.E.2d 804, 2000-Ohio-10, citing *Cupp v. Murphy* (1973), 412 U.S. 291, 294-96, 93 S.Ct. 2000. In applying this exception, the United States Sixth Circuit Court of Appeals has held that "[w]hen police officers seek to rely on this exception in justifying a warrantless entry, they must show an objectively reasonable basis for concluding that the loss or destruction of evidence is

imminent." *United States v. Sangineto-Miranda* (C.A.6 1988), 859 F.2d 1501, 1512. In order to do so, the court established the following test:

> **[A] police officer can show an objectively reasonable belief that contraband is being, or will be, destroyed within a residence if he can demonstrate: 1) a reasonable belief that third parties are inside the dwelling; and 2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order.**

*Id*., citing *Vale v. Louisiana* (1970), 399 U.S. 30, 34-35, 90 S.Ct.1969; see, also, *United States v. Ukomadu* (C.A.6 2001), 236 F.3d 333; *United States v. Radka* (C.A.6 1990), 904 F.2d 357.

{¶30} In *Sangineto-Miranda*, officers were provided information through a confidential informant with whom they were working that one of the defendants, Betts, had two kilograms of cocaine in his apartment and was ready to negotiate a deal with the "money man" (an undercover officer posing as a customer who wanted to purchase thirteen kilograms of cocaine). *Id*. at 1505, 1513. The informant also told them that another defendant, Nelson, was also in the apartment when he was there earlier. *Id*. at 1513. The officers arranged for the informant to get Betts away from the apartment because the operation was becoming too dangerous. *Id*. at 1505. The informant left the apartment with Betts, and the two went to a public telephone at a nearby store to call the "money man." *Id*. When they arrived at the phone booth, Betts was arrested. *Id*.

{¶31} Several officers then went to the apartment to secure it to ensure that the evidence would not be destroyed because they believed Nelson was still inside the apartment. *Id.* Meanwhile, another officer left to obtain a search warrant. *Id.* at 1506, fn. 3. When the officers entered the apartment, they found Nelson sitting on a couch. *Id.* at 1505. The officers secured the apartment but did not search it until the other officer returned with a search warrant. *Id.* at 1513. The officers then searched the apartment.[2] *Id.* at 1506, fn. 3.

{¶32} The Sixth Circuit Court of Appeals found that "the officers * * * had an objectively reasonable basis for concluding that the loss or destruction of evidence was imminent." *Id.* at 1512. Specifically, the court found that the police reasonably believed that "Betts's continued absence, while a search warrant was being secured, would alert Nelson that the police were on their trail, thereby prompting him to destroy narcotics." *Id.* at 1513. The court found that it was not likely that the police had probable cause to obtain a warrant until the informant told them that Betts had two kilograms of cocaine and was ready to sell to the "money man[,]" that an officer sought a warrant shortly after learning this information, and that the officers "did no more than 'secure' the premises to ensure their safety and to prevent the loss or destruction of evidence." *Id.* Thus, the court held that the police "were justified in entering the * * * apartment

---

[2] The search revealed a pistol, several scales, plastic bags, and only a small amount of cocaine rather than two kilograms as the informant had told them.

without a warrant for the limited purpose of 'securing' the premises and preventing the loss or destruction of evidence." *Id*.

**{¶33}** In the case sub judice, the detectives received an anonymous tip that Holt was driving a white Oldsmobile Bravada to Columbus to buy heroin. They had received information previously that Holt was selling drugs. Based on this tip, they began watching Holt's residence because they were unsure of the path he would take on his return trip from Columbus. After watching the home for approximately two hours and observing no activity, they elected to end their surveillance and were actually driving away when Det. Ward noticed a black Bravada, occupied by two white males, drive past him, and he transmitted this information to his fellow detectives.[3] Det. Ice then saw a black Bravada parked in front of Holt's residence. Det. Musser re-established surveillance and noticed activity inside the home. In addition, Sanchez and a female child entered the home and Sanchez left alone shortly thereafter. An unidentified male also entered the home, and Smith, who the detectives were unable to identify as the same man seen entering, left the home. Smith and Sanchez were both questioned by the detectives, independent of one another, and both indicated that Holt had just given them heroin in a balloon(s). Sanchez also stated that she received her heroin in exchange for babysitting Holt's child.

---

[3] Det. Musser testified that a Bravada is a fairly distinctive vehicle that is not very common in Marion County, Ohio.

{¶34} Further, Smith told the detectives that he had been with Holt that day, they drove to Columbus where Holt purchased $800 worth of heroin, they had "just gotten back," and Holt gave a balloon of heroin to Sanchez. Smith also told them that Holt had more heroin at his house but Smith was unsure of the quantity. In addition, Smith stated that he was delivering the five balloons of heroin they found on him to a man named "Scuba Steve," who was supposed to be in a tan-colored truck on Toledo Avenue, which is the street upon which they were talking to Smith. Smith was also very nervous and stated that he did not want to be seen with the detectives. When asked why he was nervous, Smith told them that he feared Holt would suspect that the police were "on to him" if Smith did not return soon. Smith worried that either Scuba Steve, who was expecting heroin, or Smith's girlfriend, who was expecting to see him soon, would call Holt and ask where Smith was.

{¶35} This information led the detectives to believe that they had probable cause for a search warrant, but they, too, feared that Holt would suspect something was amiss and destroy the remaining heroin before they could obtain a warrant, which they testified takes approximately 1 to 1 ½ hours to procure. Therefore, they called their supervisior, Lt. Gruber. Lt. Gruber testified that in addition to the normal time it takes to obtain a warrant, he knew that there was city council

meeting to discuss budget cuts and that the routine availability of the municipal court judge was going to take longer because of that meeting.

{¶36} While Lt. Gruber was en route to Holt's home, Det. Musser also contacted the prosecutor to determine their legal options and was advised that they could knock on the door of the home and enter the home if someone answered the door to secure it but that they were not to search until a warrant was issued. While Det. Ward, Det. Musser, and Lt. Gruber were determining what to do to prevent any evidence from being destroyed, Det. Ice was in the process of obtaining a warrant.

{¶37} Upon approaching the house, the officers knocked on the door, waited for it to be answered, announced who they were, and secured the living room. The officers then went to the kitchen to secure Holt and followed him out of the home when he ran. Once Holt was apprehended, they returned to the home, secured the heroin that was thrown into the yard, and secured the house until the warrant arrived. Only when the warrant arrived did they then search the home.

{¶38} However, Holt asserts that the information from Smith and Sanchez was not reliable because both initially provided false information to the detectives and that the detectives did not attempt to verify that there was a person fitting the description of "Scuba Steve." Although Holt correctly asserts that Smith and Sanchez initially gave some false information to the detectives and that the

officers did not look for someone fitting the description of "Scuba Steve", the officers did have sufficiently reliable information, nevertheless.

{¶39} First, both Smith and Sanchez gave information supported by the surveillance of Holt's home: 1) Smith stated that he and Holt drove the Bravada to Columbus to buy heroin and just returned to Marion – the officers witnessed the Bravada, occupied by two people, en route to Holt's home, saw it parked at Holt's house only a short time before stopping Smith, and saw activity in the home after having watched it for two hours without seeing any activity; 2) Smith stated Holt gave Sanchez a balloon of heroin – a balloon of heroin was found in Sanchez's car and she stated that Holt gave it to her; and 3) Sanchez stated Holt gave her the heroin because she watched his child – the detectives saw Sanchez enter the home with a child and then saw her leave alone.

{¶40} Second, the task force was previously informed that Holt was selling drugs and had a specific tip that he was going to Columbus that day to buy heroin. Although the vehicle was a significantly different color, it was the same make and model. Further, the remainder of the tipster's information was confirmed by Smith, i.e. Smith told them that he went with Holt to the same town identified by the tipster (Columbus) to buy the same drug identified by the tipster (heroin).

{¶41} Much like the facts in *Sangineto-Miranda*, it is unlikely in this case that the task force had probable cause to secure a search warrant for the home

before receiving the information from Smith and Sanchez and finding the heroin on them. Once the police received this information, Det. Ice began taking steps to secure the warrant. Moreover, like *Sangineto-Miranda*, the police did no more than secure the premises to ensure their safety and to prevent the loss or destruction of evidence, only seizing the heroin when Holt ran and threw it into the yard and Lt. Gruber was left alone to secure two adults and two children in a home that had not been fully made safe through a protective sweep for persons and weapons.

{¶42} Holt also contends that the State failed to demonstrate that the officers feared "imminent" destruction. In support of this contention, Holt refers to the time lapse of nearly an hour between when the Bravada arrived at the residence at approximately 6:20-6:30 p.m., when Smith and Sanchez were stopped, and when the detectives entered the home at approximately 7:30-8:00 p.m. Thus, Holt maintains that the stated purpose for concern, i.e. Smith not returning and others soon calling Holt, which would alert Holt to police involvement and lead him to destroy or otherwise remove the heroin, was unfounded because the detectives took nearly an hour before entering the home.

{¶43} While this may be a concern, the evidence presented at the suppression hearing refutes Holt's stated times. More specifically, when counsel for Holt questioned the detectives about the time frame for these events, using the

reports they individually generated, the State then introduced reports generated by the Computer Aided Dispatch ("CAD") program that the police use. Lt. Gruber testified that the police "dispatch center maintains CAD notes of radio traffic and things of that nature," which consists of a log of people out on calls. He further testified that the CAD notes are the "best way" to determine time frames because the dispatchers are entering that information while it is occurring, and earlier testimony revealed that the detectives generate their own reports once on station and record their times according to their memory.

{¶44} The CAD notes from February 23, 2009, indicated that Sanchez was stopped at 6:58 p.m. and her heroin was found at 7:08 p.m. It also indicated that Smith's heroin was found at 7:06 p.m. The notes further showed that the police entered the home at 7:22 p.m. and that Holt ran at that time. Also, these notes indicated that Holt was apprehended and the home secured at 7:28 p.m. Thus, the CAD notes revealed that the detectives entered the home less than twenty minutes after obtaining information sufficient to obtain a warrant. The CAD notes also confirmed the testimony of the detectives that everything happened fairly quickly once the Bravada was spotted despite the seeming disparity in times noted in the detectives' individual reports. Thus, the trial court could reasonably have relied upon the CAD time frames to support its finding that the police had a reasonably

objective basis for concluding that the loss or destruction of evidence was imminent.

**{¶45}** Given these facts, we find that the police had an objectively reasonable belief that the destruction of heroin was imminent and they were justified in entering 492 Silver Street for the limited purpose of securing the premises and preventing the loss or destruction of evidence. Furthermore, their mode of entry was also reasonable given the need to act quickly, the limited time they had to organize an entry, and the fact that their need to act quickly resulted in an entry team consisting of only three men who were in plain clothes, armed with merely their sidearms, and only a vest to protect them, rather than entry by a heavily armed SWAT team in full protective gear. Additionally, they knocked on the door, waited for it to be answered before entering the home, and immediately identified themselves as police officers.

**{¶46}** For these reasons, the first assignment of error is overruled.

### *Second, Third, Fourth, Fifth, and Sixth Assignments of Error*

**{¶47}** Holt's second, third, fourth, fifth, and sixth assignments of error each pertain to either the sufficiency or manifest weight of the evidence. In addition, a number of these assignments of error have interrelated issues. Accordingly, we elect to address these five assignments of error together and, at times, out of the order in which they appear.

Standards for Review

**{¶48}** Reviewing a challenge to the sufficiency of the evidence requires this Court to examine the evidence in the light most favorable to the prosecution. The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.

**{¶49}** Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 1997-Ohio-52. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id*. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly

-24-

lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3rd Dist. No. 1-05-70, 2006-Ohio-3764, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

Sixth Assignment of Error

**{¶50}** In his sixth assignment of error, Holt contends that the evidence was insufficient to prove that Holt committed the offense of possession of heroin. In order to prove that Holt was guilty of possession of heroin, as charged in Count One of the indictment, the State had to show that on or about February 23, 2009, in Marion County, Ohio, Holt knowingly obtained, possessed, or used heroin in an amount that exceeded five grams but was less than ten grams. See R.C. 2925.11(A), (C)(6)(c).

**{¶51}** The only element of this offense that Holt asserts was not proven was the weight of the heroin. More specifically, Holt contends that the forensic scientist who analyzed the heroin testified that she simply took a random sample of the forty-six balloons, determined that those eighteen balloons contained heroin, and then weighed *all* of the balloons to arrive at a total weight of 5.5 grams. He further asserts that this witness estimated 2.8 grams of the submitted substances were not tested to determine whether they, too, were heroin. Therefore, he

maintains that the State did not prove beyond a reasonable doubt that the amount of heroin was in excess of five grams but less than ten grams.

{¶52} The random sampling method of testing has been consistently upheld by Ohio courts. See *State v. Rose*, 144 Ohio App.3d 58, 759 N.E.2d 460, 2001-Ohio-3297; *In re Lemons* (1991), 77 Ohio App.3d 691, 696, 603 N.E.2d 315; *State v. Mattox* (1983), 13 Ohio App.3d 52, 468 N.E.2d 353; *State v. Smith* (Dec. 23, 1997), Franklin App. No. 97APA05-660, 1997 WL 798301. The "random sampling method of testing creates a reasonable inference that all similar contraband contains the same controlled substance as that tested, at least when the contraband is recovered together and similarly packaged." *State v. Samatar*, 152 Ohio App.3d 311, 787 N.E.2d 691, 2003-Ohio-1639, at ¶ 81. "Accordingly, evidence of the random-sampling method is sufficient as a matter of law to support a determination that the entire substance recovered together and similarly packaged is the same controlled substance as that tested." *Id*.

{¶53} Jennifer Acurio, a forensic scientist with the Bureau of Criminal Identification and Investigation ("BCI"), testified that she was assigned to this case to analyze the balloons that were submitted by the task force, which were admitted at trial as State's Exhibit 3A. She testified that the suspected heroin was all packaged in the same way and each looked the same as the others. She further testified that she first weighed the entire package and then removed the suspected

heroin and reweighed the packaging. After determining the weight to be 5.5 grams, she chemically tested eighteen of the forty-six balloons. She testified that the eighteen balloons she tested were chosen at random by a statistical sampling program that BCI utilizes. Acurio testified that her method of testing and this program have been determined by the scientific community to be an acceptable method of testing controlled substances. She found that each of the eighteen balloons contained heroin. Based upon her examination, Acurio concluded that State's Exhibit 3A contained 5.5 grams of heroin, although the total weight of only the eighteen tested samples would have been approximately 2.2 grams. Acurio's written report of her findings was also admitted into evidence as State's Exhibit 2A.

{¶54} When considering this testimony and the exhibits that were admitted into evidence in a light most favorable to the prosecution, we find that the State presented sufficient evidence to support the jury's determination beyond a reasonable doubt that Holt was in possession of heroin in an amount in excess of five grams but less that ten grams. Thus, the sixth assignment of error is overruled.

Fifth Assignment of Error

{¶55} In Holt's fifth assignment of error, he asserts that his conviction for tampering with evidence, as alleged in Count Six of the indictment, was against

the manifest weight of the evidence. To prove this charge, the State had to show that on or about February 23, 2009, in Marion County, Ohio, Holt, knowing that an official proceeding or investigation was in progress, or was about to be or likely to be instituted, altered, destroyed, concealed, or removed any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation. See R.C. 2921.12(A).

{¶56} Holt contends that he did not act with purpose to destroy, conceal, or impair the value or availability of the evidence. To the contrary, Holt maintains that he was startled by the sudden confrontation with the police, who had attempted to grab him, and that his actions actually *revealed* the location of the evidence rather than concealing it.

{¶57} Initially, we note that Holt has blended two different elements into one argument. First, R.C. 2921.12(A) requires that the State prove that the offender altered, destroyed, concealed, or *removed* any record, document, or thing, knowing that an investigation was in progress or likely to be instituted. Second, the State must prove that the offender's purpose in so doing was to impair the value or *availability* of the record, document, or thing.

{¶58} Various appellate courts have considered factual scenarios similar to the case sub judice and found that the actions of the defendants in those cases constituted tampering with evidence. See, e.g., *State v. Pickett*, 9th Dist. No.

23408, 2007-Ohio-4135, at ¶ 13 (affirming conviction for tampering with evidence of passenger in a stopped vehicle who immediately fled from police upon seeing officer and removed money and 84 grams of cocaine from his pocket and threw them to the ground while being chased by officer); *State v. Salaam*, 1st Dist. No. C-020324, 2003-Ohio-1021, at ¶ 6 (holding that "evidence of a defendant seen throwing away a bag of illegal drugs while fleeing from police is sufficient to establish the elements of the offense of tampering with evidence"); *State v. Ross*, 2nd Dist. No. 19036, 2002-Ohio-6084 (affirming a conviction for tampering with evidence when the defendant threw a bag of drugs to the ground when approached by officers); *State v. Jackson*, 10th Dist. No. 02AP-188, 2002-Ohio-4728 (finding that the actions of throwing drugs from a moving vehicle during a police pursuit constitute tampering with evidence).

{¶59} Here, the evidence revealed that Holt was in his kitchen, holding a small child and a carton of eggs, when three officers in plain clothes entered his home. Two of the officers, one of whom was wearing a vest clearly marked "Sheriff" and the other of whom had his badge displayed from a chain around his neck, approached Holt. Det. Musser testified that he repeatedly stated, "Police, show me your hands[,]" and that Holt appeared to understand that they were law enforcement officers but that he did not "think [Holt] liked the fact."

{¶60} Instead of showing his hands to the officers, Holt dropped the carton of eggs, sat the child down, and began reaching for the back door. The detectives attempted to grab Holt's arm, but he was able to slip from their grasps and flee out the back door. The detectives immediately gave chase, shouting, "Police, stop." Holt continued to run. At some point, Holt removed a cellophane bag containing the forty-six balloons of heroin, threw the bag, and continued running. The bag hit a metal shed in the back yard, making a noise that enabled the police, who continued chasing Holt, to later determine a more particularized vicinity to search for the item that Holt had thrown once they had him in custody. Nevertheless, it was dark outside and they had to use a flashlight in order to find the bag of heroin.

{¶61} Having reviewed the entire record, weighing the evidence and all of the reasonable inferences and considering the credibility of witnesses, we do not find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction for tampering with evidence must be reversed and a new trial ordered. To the contrary, the evidence demonstrated that Holt ran when confronted by the police, thereby *removing* the heroin from the house, whereupon he then *removed* the heroin from his pocket, and threw it while the police were running after him; all of which was in an effort to impair its availability in an investigation and/or subsequent prosecution against him for possession of heroin. The jury could have readily concluded that Holt was not startled and merely

reacting spontaneously but rather made a choice to flee from the officers because he had heroin in his pocket and did not want to be caught with the heroin on his person. Given these facts, Holt's conviction was not against the manifest weight of the evidence, and the fifth assignment of error is overruled.

Second Assignment of Error

{¶62} In Holt's second assignment of error, he maintains that the evidence was insufficient to support his conviction for having a weapon while under disability, as alleged in Count Six of the indictment. To prove this charge, the State had to show that on or about February 23, 2009, in Marion County, Ohio, Holt knowingly acquired, had, carried, or used a firearm, having been convicted of any felony offense of violence. See R.C. 2923.13(A)(2). Holt's sole challenge on this count is that the State failed to demonstrate that the Ruger P95 9mm pistol, which he admitted purchasing, constituted a "firearm." More specifically, Holt asserts that the State failed to prove that the pistol was operable.

{¶63} The Revised Code defines the term "firearm" as follows: "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. 'Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(B)(1). The Revised Code further states: "When determining whether a firearm is capable of expelling or propelling one or more

-31-

projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2). Thus, the State must show that the gun was operable or readily rendered operable in order for the gun to satisfy the definition of a firearm.

{¶64} The Ohio Supreme Court has held that "the state can rely upon all of the surrounding facts and circumstances" in order to demonstrate that a certain object at issue constitutes a firearm. *State v. Murphy* (1990), 49 Ohio St.3d 206, 207, 551 N.E.2d 932. Further, "proof of the existence of a firearm may be based on lay testimony, and is not dependent on an empirical analysis of the gun." *Id.* at 209. In reaching this conclusion, the Court relied on interpretations of similar laws rendered in other jurisdictions. One such case, *State v. Millett* (Me. 1978), 392 A.2d 521, held that the handgun need not be admitted into evidence and that witnesses who testified they saw the handle and hammer of a handgun protruding from the defendant's belt were sufficient to prove the existence of a firearm. *Murphy*, 29 Ohio St.3d at 209, citing *Millett*, 293 A.2d at 527-528.

{¶65} The Court further explained the permissibility of relying upon circumstantial evidence to determine whether a gun was operable in *State v. Thompkins*. *Thompkins*, supra. In *Thompkins*, the court relied upon its previous

decisions regarding the weight to be afforded to circumstantial evidence. The Court noted,

> **In *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, we held: "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction. * * * " *Id*., paragraph one of the syllabus.**

*Thompkins*, 78 Ohio St.3d at 385, fn.2. Thus, the court found that pointing an object that appears to be a gun at another person, whether a threat was expressly or implicitly made, was sufficient evidence of the operability of the gun. *Thompkins*, 78 Ohio St.3d at 385.

{¶66} In the case sub judice, Lt. Gruber testified that Det. Musser picked up the coat and handed it to him, saying, "Look at this." When Lt. Gruber looked at the coat, he saw the gun. He further testified that finding the gun was "more than a little bit disheartening to me as I've been standing there for an hour plus with two adults sitting on the couch and kids on the couch with this loaded gun there that I didn't know was there." Lt. Gruber then removed the gun, checked to see if it was safe by removing the loaded magazine from the gun and examining the chamber for any bullets, and ordered another officer to return to the police department to retrieve a gun box to secure the gun "because [he] wasn't real crazy

about just having it laying [*sic*]." Lt. Gruber, who was in his sixteenth year of being a law enforcement officer, further testified that the gun appeared to him to be operable.

{¶67} Lt. Gruber's experience as an officer, his examination of the gun, his opinion that the gun was operable based upon that examination, and the presence of two loaded magazines, one of which was actually inside of the gun, was sufficient evidence for a rational trier of fact to conclude that the gun was operable. Thus, the second assignment of error is overruled.

### Third and Fourth Assignments of Error

{¶68} Holt asserts in his third assignment of error that the evidence was insufficient to prove the firearm specification. He further contends in his fourth assignment of error that his conviction for the firearm specification was against the manifest weight of the evidence.

{¶69} To prove the firearm specification, the State had to demonstrate that on or about February 23, 2009, in Marion County, Ohio, Holt had a firearm on or about his person or under his control while committing the offense. See R.C. 2941.141(A); see, also, R.C. 2929.14(D)(1)(a)(iii) (requiring that the offense be a felony in order to impose a mandatory term of imprisonment for one year). The offense at issue here, according to the indictment, is the offense of possession of heroin as alleged in Count One, a felony.

{¶70} Holt once again maintains that the State failed to prove that the pistol was an operable firearm. Given our discussion regarding the State's evidence on the operability of the pistol, we find this contention, likewise, to be without merit. However, Holt also asserts in regards to the firearm specification that the State failed to prove that the gun was on or about his person or under his control while he was in possession of heroin because the evidence revealed that the gun was in the living room and he was in the kitchen.[4] We disagree.

{¶71} Simply because Holt did not have his gun on his person at the precise moment he was found with heroin in his pocket does not mean that the firearm was not under his control contemporaneously with his being in possession of the heroin. For instance, possession can be actual or constructive. *State v. Wolery* (1976), 46 Ohio St.2d 316, 329, 348 N.E.2d 351. Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical

---

[4] Holt also maintains that the State failed to demonstrate that he displayed the firearm, brandished it, indicated that he possessed it, or used it to facilitate the offense in accordance with R.C. 2941.145 and R.C. 2929.14(D)(1)(a)(ii). However, those sections are for a three-year firearm specification. Holt was charged with a one-year firearm specification in accordance with R.C. 2941.141 and R.C. 2929.14(D)(1)(a)(iii). Thus, the State was not required to show that Holt displayed, brandished, indicated he possessed, or used the firearm to facilitate the offense. Accordingly, those portions of the third and fourth assignments of error are overruled.

possession. *State v. Hankerson* (1982), 70 Ohio St.2d 87, 434 N.E.2d 1362; see, also, *State v. Reeves*, Cuyahoga App. No. 81916, 2003-Ohio-3528; *State v. Spurlock*, 3rd Dist. No. 5-03-11, 2003-Ohio-6006, at ¶ 18. Moreover, R.C. 2941.141 states that the firearm must be on or about the offender's person *or* under the offender's control.

{¶72} In the case sub judice, the firearm was located in Holt's coat, which was on the back of the couch in his living room. Holt was found in the kitchen, which is located adjacent to the living room. When Holt ran from the police, he was wearing only pants, and he removed the heroin from the pocket of his pants and threw it while he was running. Thus, a factfinder could readily conclude that Holt had the heroin in his possession when he was in the kitchen. In addition, the firearm was located within Holt's easy access, in his living room, and he clearly exercised the requisite dominion and control over the same. Accordingly, the State presented sufficient evidence that the firearm was under Holt's control while he was in possession of the heroin.

{¶73} Further, Holt admitted that he bought the gun that day for $80. It was found in his coat shortly after the officers noticed activity in the house once the Bravada appeared at the home. Additionally, the weather was cold as evidenced by the snow/ice in the photographs that were submitted into evidence and the fact that the search of his home occurred in February in Ohio. Therefore, a

factfinder could reasonably have inferred that Holt had the gun with him on his trip to Columbus to purchase the heroin or purchased the gun on his way back to his home and upon arriving back home, he took off his coat and placed it on the couch.

**{¶74}** Given this evidence and construing it in a light most favorable to the prosecution, we do not find that the evidence was insufficient to support his conviction for the firearm specification. Furthermore, the record does not support a conclusion that the jury clearly lost its way and created a manifest miscarriage of justice warranting a reversal on the firearm specification. Accordingly, Holt's third and fourth assignments of error are also overruled.

*Seventh Assignment of Error*

**{¶75}** In his seventh assignment of error, Holt maintains that his sentence was excessive and contrary to law. An appellate court must conduct a meaningful review of the trial court's sentencing decision. *State v. Daughenbaugh*, 3rd Dist. No. 16-07-07, 2007-Ohio-5774, at ¶ 8, citing *State v. Carter*, 11th Dist. No. 2003-P-0007, 2004-Ohio-1181. A meaningful review means "that an appellate court hearing an appeal of a felony sentence may modify or vacate the sentence and remand the matter to the trial court for re-sentencing if the court clearly and convincingly finds that the record does not support the sentence or that the sentence is otherwise contrary to law." *Daughenbaugh*, 2007-Ohio-5774, at ¶ 8,

citing *Carter*, 2004-Ohio-1181, at ¶ 44; R.C. 2953.08(G).[5] Clear and convincing

evidence is "[t]he measure or degree of proof that will produce in the mind of the

trier of fact a firm belief or conviction as to the allegations sought to be

established. It is intermediate, being more than a mere preponderance, but not to

the extent of such certainty as required beyond a reasonable doubt as in criminal

cases. It does not mean clear and unequivocal." *In re Estate of Haynes* (1986), 25

Ohio St.3d 101, 103-04, 495 N.E.2d 23.

**{¶76}** In *State v. Foster*, 109 Ohio St.3d 1, 845 N.E.2d 470, 2006-Ohio-

856, the Supreme Court of Ohio found those portions of the felony sentencing

statute requiring judicial fact finding before the imposition of a sentence to be

unconstitutional. The Court stated, "[t]rial courts [now] have full discretion to

impose a prison sentence within the statutory range and are no longer required to

make findings or give their reasons for imposing maximum, consecutive, or more

than the minimum sentences." *Id*. at paragraph seven of the syllabus.

**{¶77}** Although the trial court is given full discretion in sentencing

pursuant to *Foster*, the trial court must consider the overriding purposes of felony

sentencing, which are to protect the public from future crimes by the offender and

---

[5]We note that the Supreme Court of Ohio's recent plurality opinion in *State v. Kalish*, 120 Ohio St.3d 23, 896 N.E.2d 124, 2008-Ohio-4912, establishes a two-part test utilizing an abuse of discretion standard for appellate review of felony sentencing decisions under R.C. 2953.08(G). While we cite to this Court's precedential clear and convincing review standard adopted by three dissenting Justices in Kalish, we note that the outcome of our decision in this case would be identical under the Kalish plurality's two part test.

to punish the offender. R.C. 2929.11(A); *State v. Scott*, 3rd Dist. No. 6-07-17, 2008-Ohio-86, at ¶ 49, citing *State v. Foust*, 3rd Dist. No. 3-07-11, 2007-Ohio-5767, at ¶ 27. Additionally, the trial court must contemplate the recidivism of the offender and the seriousness of the conduct pursuant to R.C. 2929.12(A). *Scott*, supra. However, the trial court is not required to discuss the factors on the record or even to state on the record that it has considered the statutory language. *Foust*, supra (citations omitted).

{¶78} Here, each of these three counts was punishable by one to five years in prison. In addition, Holt's conviction for possession of heroin included a mandatory term of imprisonment of one year for the firearm specification. Thus, he could have potentially been sentenced to a maximum of sixteen years.

{¶79} At the sentencing hearing, the court noted on the record that it had considered the "general factors required by the Ohio Revised Code in determining the sentence to be imposed," and the judgment entry states that the court "considered the record, oral statements, any victim impact statement and pre-sentence report prepared, as well as the principles and purposes of sentencing under R.C. 2929.11, and the appropriate factors under R.C. 2929.12." The court then sentenced Holt to four years on Count One, two years each on Counts Five and Six, and ordered that they be served consecutively to one another and consecutively to the mandatory one-year firearm specification for an aggregate

sentence of nine years. Each sentence was well within the statutory range for sentencing. Further, the record demonstrated Holt's prior convictions, beginning with an aggravated robbery at age sixteen for which he was tried as an adult and was sentenced to prison, and his subsequent and numerous misdemeanor convictions as an adult. The record also demonstrated Holt's pattern of drug abuse related to the instant offenses, which he openly acknowledged, as well as the facts of the instant case. Accordingly, we find that the sentence was supported by law and the record. Thus, the trial court did not err in sentencing Holt in the manner that it did, and the seventh assignment of error is overruled.

{¶80} For all these reasons, each of the seven assignments of error is overruled, and the judgment of the Common Pleas Court of Marion County, Ohio, is affirmed.

*Judgment Affirmed*

**ROGERS, J., concurs in Assignments of Error 1, 5, 6 and 7, and Concurs in Judgment Only in Assignments of Error 2, 3 and 4.**

**/jlr**

**WILLAMOWSKI, P.J., concurring separately.**

{¶82} I concur fully with the majority opinion, however write separately to emphasize that the appropriate standard of review for the seventh assignment of error was applied. In his assignments of error, Holt alleges that the trial court

imposed an excessive sentence. Pursuant to R.C. 2953.08(G)(2), the appropriate standard of review for an appeal of his issue would be whether the judgment is clearly and convincingly contrary to law. *State v. Kalish*, 120 Ohio St. 3d 23, 2008-Ohio-4912, 896 N.E.2d 124. Holt's appeal of his felony sentence did not raise issue with the application of the factors set forth in R.C. 2929.12, which in my opinion would require an abuse of discretion standard. Thus, the clearly and convincingly standard used to review this case, as set forth in R.C. 2953.08(G)(2) is the proper standard of review herein.