**In re LEMONS.**

[Cite as *In re Lemons* (1991), 77 Ohio App.3d 691.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 59105.

Decided Oct. 15, 1991.

*Stephanie Tubbs Jones,* Prosecuting Attorney, and *Gary DeRocco,* Assistant Prosecuting Attorney, for appellee.

*Eugene S. Bayer* and *Rhonda Patsouras,* for appellant.

---

ANN MCMANAMON, Judge.

Robert Lemons, a juvenile, timely appeals an adjudication of delinquency based on a conviction for trafficking in drugs (R.C. 2925.03[A][5] ). He advances two assignments of error challenging the chain of custody and the scientific examination of the substances in question. A review of the record compels our affirmance.

Lemons and another juvenile, Robert Hicks, came to police attention on Friday, April 14, 1989. They were noticed on a Cleveland street corner engaging in suspicious activity with pedestrians. Michael Blanc, a plainclothes detective, approached the boys while another officer watched their actions with binoculars from a police car. Hicks told Blanc about some "dynamite crack" and then pulled a "small, white rock like substance" out of his pocket saying he wanted "twenty dollars" for it. When Blanc told Hicks the rock was too small, Lemons and Hicks took him to their automobile, which was parked nearby. Lemons opened the passenger door, reached in the glove box and produced a white plastic bag with approximately thirty white rocks in it.

Thereafter, Detective Stephen Stropko approached, identified himself as a police officer and arrested Lemons and Hicks. Detective Blanc grabbed the plastic bag and, after a patdown of Hicks, recovered yet another "rock." The detectives also confiscated $231 in cash from Lemon's pocket as well as a beeper.

This appeal results from Lemon's subsequent adjudication of delinquency for drug trafficking.

In his first assignment of error, Lemons contends the trial court erred in admitting thirty-one rocks of crack cocaine into evidence because police did not maintain a proper chain of custody.

 The state bears the burden of establishing the proper chain of custody; however, it is not an absolute duty. *State v. Moore* (1973), 47 Ohio App.2d 181, 183, 1 O.O.3d 267, 268, 353 N.E.2d 866, 870. In order to meet its burden, the state need only prove that it is "reasonably certain that substitutions, alteration or tampering did not occur." *Id.* The state need not negate all possibilities of substitution or tampering. *Id.* Moreover, a chain of custody can be established by direct testimony or by inference. *State v. Conley* (1971), 32 Ohio App.2d 54, 60, 61 O.O.2d 50, 54, 288 N.E.2d 296, 300. The issue of whether there exists a break in the chain of custody is a determination left up to the trier of fact. *Columbus v. Marks* (1963), 118 Ohio App. 359, 25 O.O.2d 228, 194 N.E.2d 791. Any breaks in the chain of custody go to the weight afforded to the evidence, not to its admissibility. *Id.*

 In the present case, the state offered testimony of four witnesses to establish and maintain a chain of custody. Detective Blanc testified that after he arrested the two defendants, he took possession of the plastic bag containing the purported crack cocaine. Upon returning to the station, he counted thirty-one "rocks." Blanc and Stropko each wrote their name and badge number on the bag. Blanc then put the bag containing the drugs into a property envelope, and filled out the information required on the outside of the envelope. Both detectives took the envelope to the narcotics unit on the sixth floor of the Third District Police Station.

Stropko averred that Detective Suponcic of the narcotics unit received the envelope from him. It is undisputed that Suponcic entered the date "April 14, 1989," a description of the property and the owner's names in a log book. Suponcic later placed the envelope into a locked metal locker.

Detective Rominski of the narcotics unit further testified that on the following Monday, April 17, he inventoried the drugs received over the weekend pursuant to standard procedures, and after ensuring that each drug entered into the log book was accounted for, he signed the envelope and noted the date and time. Rominski delivered the envelope and log book to Officer Davis of the Scientific Investigation Unit ("SIU"). He then put a line through the entry in the book and Officer Davis of SIU initialed the same page and noted the date, April 17, 1989. Rominski acknowledged on cross-examination

that anyone in the narcotics unit had access to the metal locker by means of a key.

Finally, Charles Sikoro, scientific examiner for the SIU Forensic Laboratory, testified that once Officer Davis received the envelope, either she or Robin Levine, an analyst, logged it in the laboratory property book and assigned it a six-digit number. Davis next completed the first half of the laboratory report with the relevant arrest information and transported the envelope to Sikoro. He, in turn, removed the evidence from the envelope, performed an analysis, completed a report, returned the evidence to the envelope and re-sealed it. Sikoro finally placed it in the locked narcotics vault until trial. According to Sikoro, on the morning of the trial, Detective Blanc signed out the envelope from Davis or Levine as required on the back of the laboratory report. Upon returning the evidence to the lab, Blanc signed his name again and either Davis or Levine initialed the report, noting the date before locking up the evidence and the report. Lemons challenges this chain of custody, contending that (1) forty-eight officers had access to the evidence; (2) between April 14 and April 17 there was no indication of the person or persons who had custody of the evidence; and (3) the state offered no evidence as to custody of the substance for the seven months from arrest to trial.

We find the state has met its burden of establishing a proper chain of custody.

The state offered evidence of the location, accounting procedures and storage of the seized matter from arrest to trial.

Since the evidence was seized on a Friday afternoon, after SIU hours, it was necessary to store the alleged narcotics for the weekend. While it is true that anyone within the narcotics unit could have access to this locker by means of a key, we find that the state sufficiently established that "it is reasonably certain that substitutions, alteration or tampering did not occur." *State v. Moore, supra,* 47 Ohio App.2d at 183, 1 O.O.3d at 268, 353 N.E.2d at 870. Detective Rominski stated that on the following Monday morning he took inventory of the items in the locker, pursuant to standard procedure, before transferring them to the lab. The evidence was kept locked over the weekend and when Rominski inventoried the items on Monday there were thirty-one rocks of purported crack cocaine as there had been on the previous Friday.

We reject defendant's argument that there was no evidence establishing in whose care the rocks were kept for the seven months before trial. Sikoro explained that the evidence was stored in a locked cabinet until Blanc retrieved it for trial. We find that the court reasonably concluded the evidence was properly accounted for and logged.

■ We also observe that this latter period was not "critical" in terms of the chain of custody since the evidence had already been analyzed and determined to be cocaine. The critical moment, according to the court in *State v. Conley* (1971), 32 Ohio App.2d 54, 61 O.O.2d 50, 288 N.E.2d 296, was earlier, when the police technician performed the chemical analysis. The *Conley* court, in considering the chain of custody with respect to LSD pills, stated:

"The important connection here is to establish that the pills sold by the defendant to Jenkins were the pills analyzed at the bureau of criminal identification and investigation (hereinafter referred to as BCI) and found to be LSD. The subsequent custody and presentation into evidence is not as important as the critical moment—the moment of the chemical analysis which formed the basis for the expert's subsequent testimony." *Id.* at 61, 61 O.O.2d at 54, 288 N.E.2d at 301.

In the present case, we find Sikoro's testimony sufficiently established the composition of the rocks.

Accordingly, defendant's first assignment of error is overruled.

■ In his second assignment of error, Lemons posits that Charles Sikoro, the examiner for SIU, did not follow the DEA/FBI standard in performing tests on the subject drugs.

Sikoro told the court he performed a laboratory analysis on the white rocks submitted to him and concluded they were cocaine.

In reaching his conclusion, Sikoro performed instrumental, chemical and micro-crystalline tests. In order for a sample to be determined positive for cocaine, the results of all tests must be mutually confirming. According to Sikoro, the first part of his analysis involved a visual examination to ensure all samples were uniform in texture, color, and composition. Since they were in this case, Sikoro randomly sampled several of the white rocks. When asked on cross-examination if there were any standards for the percentage of a compound that he tested, Sikoro replied:

"The accepted scientific procedure that we use is the square root. You take the number of samples that you have and you test the square root of that number."

Sikoro admitted he did not count the number of samples to determine the square root, but, estimated how many there were.

At trial, the following colloquy occurred between Sikoro and defense counsel:

"Q. * * * You cannot say whether you tested five or six pieces.

"A. That's correct sir.

"Q. And did you learn all this at the FBI lab? About the square root? That's a good rule. Who annunciates that rule?

"A. Actually, I learned it from the DEA.

"Q. DEA?

"A. The Drug Enforcement Administration conducted a training work shop at a meeting at the Midwestern Association of Forensic Scientists that I attended, and it was from them that I was * * *

"Q. Learned about the square root.

"A. * * * learned about the square root, yes.

"Q. But, it's also possible, as it was in this case, that when you're doing a lot of testing, you don't always, and didn't in this case, compute the square roots, and do the square roots.

"A. That's correct."

It is undisputed that Sikoro did not follow the "square root" procedure presented at an unspecified "training workshop." We are unaware that this methodology is mandated by any scientific body, nor has any such evidence been presented. However, Sikoro testified that he randomly tested several of the white rocks in performing his analysis. The random sampling method of testing has been upheld by several courts. See *State v. Mattox* (1983), 13 Ohio App.3d 52, 53, 13 OBR 55, 56, 468 N.E.2d 353, 355; *State v. Olding* (July 1, 1982), Montgomery App. No. 7552, unreported; *State v. Tata* (Apr. 6, 1981), Greene App. No. 1134, unreported, 1981 WL 2748. Therefore, the random testing conducted by Sikoro was substantial evidence from which the trial court could properly conclude beyond a reasonable doubt that all thirty-one rocks contained cocaine. See, also, *State v. Mattox, supra,* 13 Ohio App.3d at 53, 13 OBR at 56, 468 N.E.2d at 355.

Defendant's second assignment of error fails and the judgment of the trial is affirmed.

*Judgment affirmed.*

HARPER and STILLMAN, JJ., concur.

SAUL G. STILLMAN, J., retired, of the Eighth Appellate District, sitting by assignment.