[Cite as *State v. Ferrara*, 2015-Ohio-3822.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | CASE NO. 14 MA 4 |
| V. | ) | |
| | ) | OPINION |
| JAMES P. FERRARA, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:        Criminal Appeal from Court of Common
                                 Pleas of Mahoning County, Ohio
                                 Case No. 13CR633

JUDGMENT:                        Affirmed

APPEARANCES:
For Plaintiff-Appellee           Paul Gains
                                 Prosecutor
                                 Ralph Rivera
                                 Assistant Prosecutor
                                 21 West Boardman St., 6th Floor
                                 Youngstown, Ohio 44503-1426

For Defendant-Appellant          Attorney J. Gerald Ingram
                                 7330 Market St.
                                 Youngstown, Ohio 44512

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

                                 Dated: September 14, 2015

DONOFRIO, P.J.

{¶1} Defendant-appellant, James Ferrara, appeals from a Mahoning County Common Pleas Court judgment convicting him of three counts of aggravated murder, following a jury trial.

{¶2} On December 14, 1974, Benjamin and Marilyn Marsh, along with their four-year-old daughter Heather, were found murdered in their Turner Road home in Canfield. Their one-year-old son was also home at the time, but only suffered a concussion and survived. Ben and Marilyn both died from gunshot wounds. Heather died from head injuries. Police located Marilyn's car, which had been in the family's garage, at a K-Mart parking lot in Austintown not long after the murders.

{¶3} The Mahoning County Sheriff's Department responded to the murder scene along with investigators from the Ohio Bureau of Criminal Identification and Investigation (BCI). The investigators lifted numerous latent fingerprints from different locations at the scene. Bullets were later recovered from the victims' bodies. But no arrests were made at the time.

{¶4} In 2009, Deputy Sheriff Patrick Mondora began familiarizing himself with the Marsh murder case. He contacted BCI fingerprint analyst Robin Ladd to see if BCI had any of the evidence from the Marsh case. Ladd located the Marsh file at BCI. She then entered the unidentified latent fingerprints found at the scene into the Automated Fingerprint Identification System (AFIS) database. The AFIS is an FBI database of known fingerprints. This technology was not available in 1974.

{¶5} The AFIS returned three "hits" on latent prints from the Marsh house. The prints had been lifted from the man door leading into the Marsh garage. AFIS identified the prints as belonging to the left middle finger, left ring finger, and left pinkie finger of appellant. Once Ladd received these hits from AFIS, she pulled appellant's fingerprint card and made a comparison to the latent prints found at the scene. She confirmed that the latent prints from the garage man door at the Marsh house were appellant's fingerprints. Ladd conveyed this information to now Detective Patrick Mondora of the Mahoning County Sheriff's Department.

{¶6} Detective Mondora interviewed appellant in February 2011. Detective

Mondora learned that appellant had worked at General Motors from 1970 until 1983. Ben Marsh had also worked at General Motors up until the time of his death. Appellant told the detective that he did not know Ben Marsh, he did not know where Ben Marsh lived, and he did not even know where Canfield was. He told the detective he had never been to the Marsh house.

{¶7} On June 20, 2013, a Mahoning County Grand Jury indicted appellant on three counts of aggravated murder, first-degree felonies in violation of R.C. 2903.01(B)(C); one count of aggravated burglary, a first-degree felony in violation of R.C. 2911.(A)(1) and (B)(2); and one count of aggravated robbery, a first-degree felony in violation of R.C. 2911.01(A)(1) and (B)(2). The aggravated burglary and aggravated robbery charges were later dismissed because the statute of limitations had expired on these crimes.

{¶8} The case proceeded to a jury trial. The jury found appellant guilty of all three counts of aggravated murder. The trial court subsequently sentenced appellant to three consecutive life sentences. Appellant filed a timely notice of appeal on January 6, 2014.

{¶9} Appellant now raises six assignments of error.

{¶10} Appellant's first assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED EVIDENCE AND TESTIMONY REGARDING LATENT FINGERPRINTS WITHOUT PROPER AUTHENTICATION.

{¶11} Appellant argues the trial court should not have admitted evidence of the latent fingerprints lifted from the outside of the Marshes' garage man door. He asserts Michael Finamore never testified that the fingerprint card admitted at trial was the same card he saw BCI investigator Bernie Albert prepare at the Marsh home on December 14, 1974. Thus, appellant contends the evidence did not meet Evid.R. 901. He also argues the state cannot prove the chain of custody. Additionally, appellant notes that photographs of the fingerprints' location on the door were lost.

For these reasons, he asserts the trial court erred in admitting the fingerprint evidence.

{¶12} The admission or exclusion of evidence is within the trial court's broad discretion and this court will not reverse its decision absent an abuse of that discretion. *State v. Mays*, 108 Ohio App.3d 598, 617, 671 N.E.2d 553 (8th Dist.1996). Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's judgment was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶13} Evid.R. 901(A) requires authentication or identification as a condition precedent to admissibility. The requirement is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). Examples of authentication or identification conforming with Evid.R. 901's requirements are:

> (1) *Testimony of witness with knowledge*. Testimony that a matter is what it is claimed to be.
>
> * * *
>
> (8) *Ancient documents or data compilation*. Evidence that a document or data compilation, in any form, (a) is in such condition as to create no suspicion concerning its authenticity, (b) was in a place where it, if authentic, would likely be, and (c) has been in existence twenty years or more at the time it is offered.

Evid.R. 901(B).

{¶14} When dealing with chain of custody matters, the state bears the burden of establishing the proper chain of custody. *In re Lemons* , 77 Ohio App.3d 691, 693 (8th Dist.1991). To meet its burden, the state must only show that it is reasonably certain that substitutions, alterations, or tampering did not occur. *Id.* The state does not have to negate all possibilities of substitution or tampering. *Id.* Breaks in the chain of custody go to the weight of the evidence, not its admissibility. *State v.*

*Howell*, 7th Dist. No. 10-MA-148, 2012-Ohio-4349, ¶79, citing *State v. Blevins*, 36 Ohio App.3d 147, 150, 521 N.E.2d 147 (10th Dist.1987).

{¶15} Michael Finamore was a Mahoning County Sheriff's deputy at the time of the murders. He assisted BCI Agent Bernie Albert in processing the murder scene. (Tr. 391). Finamore testified that he watched Albert dust the garage man door for fingerprints. (Tr. 399). He then watched Albert lift the prints and place them onto white card stock. (Tr. 399-400). Finamore also witnessed Albert label the prints, date them, and initial them. (Tr. 400). Finamore then identified the fingerprint cards admitted into evidence as those he watched Albert prepare at the scene. (Tr. 403-406; State Ex. 43A, B, C, D).

{¶16} Robin Ladd, a BCI forensic scientist in the latent print division, testified that when evidence is submitted to BCI, it is assigned a case number and is placed into a secured property room. (Tr. 565). She testified that the fingerprints from the Marsh case were kept in BCI's "old file room, which is the secured locked room that's in the back area of [the] lab." (Tr. 567-568). She stated latent prints from very old cases were kept with the files in the "locked room." (Tr. 568). Ladd stated that, as far as she knew, the latent prints from the Marsh case were kept at BCI's London, Ohio office since 1974. (Tr. 585). Ladd stated that the London office relocated once in 1999. (Tr. 589). On cross examination, Ladd stated that she first looked at the prints in 2009, and prior to that time she could only assume that they were located in the secured property room. (Tr. 590). But on redirect she testified that evidence stored at BCI is not accessible to anyone other than lab personnel. (Tr. 610). Likewise, to her knowledge, the fingerprints were never accessible to anyone other than lab personnel. (Tr. 610). Ladd also testified that she reviewed the reports of other examiners from the 1970's and stated that everything in the Marsh case file "was exactly what went with that case file" so all of the evidence could be "taken back" to the original submissions. (Tr. 610).

{¶17} Finamore's and Ladd's testimony support the identification and chain of custody for the fingerprints lifted from the Marsh home.

**{¶18}** Firstly, Finamore identified the fingerprints that Albert lifted from the crime scene on the white card stock that were dated and initialed by Albert. Finamore was a witness with knowledge because he witnessed Albert dust for and lift the prints. He gave testimony that the fingerprints were the same fingerprints lifted from the crime scene in 1974. Thus, the fingerprint evidence complied with Evid.R. 901(1) because it was supported by testimony of a witness with knowledge.

**{¶19}** Secondly, Ladd's testimony is adequate to support the chain of custody. She testified that all of the evidence from the Marsh case matched the reports of the examiners from the 1970's, so she was able to conclude that nothing was missing from the case file. She further testified that the fingerprint evidence was stored in a locked room in the BCI lab and only lab personnel had access to the room. Ladd could not state with one-hundred-percent certainty that the fingerprint evidence was stored in the locked room since 1974. But Ladd's testimony that the evidence was where it was supposed to be and included everything from the 1970's reports is sufficient to establish the chain of custody. The state only had to show it was *reasonably certain* that the evidence was not altered or tampered with. *Lemons*, 77 Ohio App.3d at 693. Any evidence as to breaks in the chain of custody was to be considered by the jury as going to weight of the evidence, not to its admissibility. *Howell*, 7th Dist. No. 10-MA-148, at ¶79.

**{¶20}** Based on Finamore's and Ladd's testimony, we cannot conclude that the trial court abused its discretion in admitting the fingerprint evidence. Accordingly, appellant's first assignment of error is without merit.

**{¶21}** Appellant's second assignment of error states:

THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT ADMITTED HEARSAY TESTIMONY RELATED TO BALLISTICS RESULTS FROM 1976 WITHOUT PROPER FOUNDATION AND IN VIOLATION OF APPELLANT'S SIXTH AMENDMENT CONFRONTATION CLAUSE RIGHTS.

**{¶22}** Here appellant contends the trial court should not have allowed testimony by forensic scientist Andrew Chappell and Detective Patrick Mondora regarding ballistics results from 1976 because the individual who performed the ballistics tests was not called to testify and could not be cross examined. Appellant asserts this testimony was inadmissible hearsay and violated his right to confront the witnesses against him.

**{¶23}** Appellant failed to object to both Chappell's and Detective Mondora's testimony. Therefore, a plain error review applies. Plain error is one in which but for the error, the outcome of the trial would have been different. *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

**{¶24}** First, we must determine whether the ballistics testimony violated appellant's right to confrontation. The Sixth Amendment's Confrontation Clause provides that in criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him.

**{¶25}** The testimony regarding the 1970's BCI submission sheet was as follows.

**{¶26}** Chappell is a BCI firearms forensic scientist who analyzed four bullet fragments recovered from the Marsh crime scene. Chappell completed his analysis in 2013. Chappell testified that the bullet evidence was originally submitted to BCI in 1974. (Tr. 541). Chappell then testified as to his findings. One of his findings was that two of the bullet fragments that were found in Ben Marsh's body were both fired from the same weapon. (Tr. 547-548). However, Chappell stated that the bullet fragments recovered from Marilyn Marsh did not exhibit any characteristics that would allow further analysis in order to determine if they too were fired from the same weapon. (Tr. 548). The prosecutor then asked Chappell if he knew how many projectiles were submitted for analysis in 1974. (Tr. 548). Chappell testified that six were initially submitted and that, according to the BCI case notes, all six bullets were matched to each other. (Tr. 548). Chappell testified that due to the soft nature of the lead and the manner in which the bullets are stored, the lead breaks down over time.

(Tr. 550).

{¶27} Appellant did not object to Chappell's testimony but his counsel did cross examine Chappell on the issue. On cross examination, Chappell stated that he was only able to analyze four bullets and of the four, he could only conclude that two were fired from the same weapon. (Tr. 552). He also stated that at the most, the four bullets were fired from three weapons. (Tr. 552). He further agreed that the person who analyzed the bullets in 1976 was "not around" and all he could do was refer to their notes. (Tr. 555).

{¶28} Detective Mondora also referred to the 1976 BCI submission sheet on re-direct examination. On cross examination, appellant's counsel asked Detective Mondora if he knew when Chappell issued his ballistics report. (Tr. 671). Counsel elicited testimony that Chappell did not issue his report until August 28, 2013. (Tr. 672). Counsel was attempting to show that the detectives did not have information regarding a .38 special until after appellant was indicted. (Tr. 672). But on re-direct, Detective Mondora referred to the 1976 BCI submission sheet and stated that it reported six bullets were analyzed and it was concluded that they were ".38 special, 148 grain, lead, Remington wad cutters * * * all fired from the same weapon." (Tr. 716). The prosecutor used this testimony to show that the detectives had information in the case file indicating the murder weapon was a .38 special long before they saw Chappell's ballistics report. (Tr. 716-717). Appellant did not object to this testimony.

{¶29} Appellant objected to the admission of the BCI submission sheet from the 1976 bullet analysis. (Tr. 750; State Ex. 63). The trial court agreed with this objection and did not allow it into evidence. (Tr. 752).

{¶30} A similar fact pattern existed in the United States Supreme Court case of *Williams v. Illinois*, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012). At Williams' rape trial, a forensic scientist at the Illinois State Police lab testified that she matched a DNA profile produced by Cellmark, an outside laboratory, to a DNA profile the state lab produced using a sample of Williams' blood. The scientist testified that Cellmark was an accredited lab and its business records showed that vaginal swabs taken

from the victim were sent to Cellmark and returned. She testified that she reviewed Cellmark's report and made her own interpretations of their data. However, the Cellmark report itself was not introduced into evidence. Williams objected to the scientist's testimony regarding Cellmark's testing, arguing it violated his right to confront the witnesses against him. The trial court overruled the objection. The Illinois Supreme Court affirmed the trial court's ruling, finding that the testimony did not violate Williams' confrontation rights because Cellmark's report was not offered into evidence to prove the truth of the matter asserted. Williams appealed to the United States Supreme Court.

{¶31} The Supreme Court affirmed the judgment finding that the scientist's testimony did not violate Williams' right to confrontation, however, the Court was divided regarding its reasoning. The plurality opinion found that "this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." (Chief Justice Alito, along with Justices Kennedy and Breyer). *Id.* at 2228. The plurality also offered another, independent basis for its decision:

> [E]ven if the report produced by Cellmark had been admitted into evidence, there would have been no Confrontation Clause violation. The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory.

*Id.*

{¶32} In this case, Chappell's and Detective Mondora's testimony regarding

the 1976 BCI submission sheet did not violate appellant's confrontation rights. Firstly, the BCI submission sheet was not admitted into evidence. Secondly, like the report in *Williams*, the BCI submission sheet was produced long before any suspect was identified and it was not created for the purpose of obtaining evidence against appellant who was not a suspect at the time. And, as was the case in *Williams*, the BCI submission sheet in this case was not inherently inculpatory. It merely concluded that six bullet fragments recovered from the victims were fired from the same weapon. Thus, appellant's right to confrontation was not violated. Therefore, the trial court did not commit plain error in allowing the witnesses to mention the BCI submission sheet.

{¶33} Next, we must determine whether the ballistics testimony violated the hearsay rule. Hearsay is an out-of-court statement, offered in court, to prove the truth of the matter asserted. Crim.R. 801(C). Subject to certain exceptions, hearsay is inadmissible. Crim.R. 802.

{¶34} Once again, the 1976 BCI submission sheet containing the ballistics results was not admitted into evidence. Thus, the submission sheet itself was not offered in court to prove the truth of the matter asserted. Additionally, Chappell testified as to his results and admitted that he was only able to examine four bullets due to the soft lead wearing down over time. (Tr. 548, 550). He testified that it was possible that the four bullets he considered were fired from three different weapons as he was only able to match two as being fired from the same weapon. (Tr. 552). And he testified his results were based on a reasonable degree of scientific certainty. (Tr. 549). Thus, he did not offer testimony to prove the truth of the 1976 ballistics results. Moreover, Detective Mondora only referenced the 1976 submission sheet on re-direct after defense counsel suggested on cross examination that the detectives had no information that the bullets were fired from a .38 caliber weapon until after appellant had been indicted. Thus, the defense invited this testimony by Detective Mondora. Therefore, we cannot conclude that the trial court committed plain error in allowing the above referenced testimony. Because the testimony was not offered to

prove the truth of the matter asserted, it was not hearsay.

**{¶35}** Accordingly, appellant's second assignment of error is without merit.

**{¶36}** Appellant's third assignment of error states:

MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL PURSUANT TO THE FOURTEENTH AMENDMENT.

**{¶37}** In this assignment of error, appellant asserts several instances of alleged prosecutorial misconduct.

**{¶38}** The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. *State v. Fears*, 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (1999). In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected the appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[T]he touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982). An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶121.

**{¶39}** Appellant first takes issue with the prosecutor's comment during closing argument:

What's really important here are the fingerprints of James Ferrara located on that back door. A house that he told Detective Mondora, I've never been there. I don't even know Ben Marsh. I don't even know where Canfield is. We know he lives in Austintown. He didn't know where Canfield was?

Sure, everybody would deny. But you know what? You're especially going to deny knowing anybody or ever being at that house if you killed the three people who lived in it. *And that evidence, too, is uncontroverted. That's what he said. You have heard nothing else. No explanation, nothing.* He didn't know Ben Marsh. He had never been to the house. Didn't know where Canfield was. Never met the guy.

(Tr. 830-831; Emphasis added). Appellant did not object to this comment.

{¶40} Appellant contends the emphasized statements were comments on his failure to testify at trial, which violated his Fifth Amendment right to stand silent at trial.

{¶41} Because appellant failed to object to the above referenced comments, we can only review this alleged prosecutorial misconduct for plain error.

{¶42} A prosecutor may comment on the relative strength of the state's case, which includes commenting on the fact that the state's case has not been rebutted. *State v. Ferguson*, 5 Ohio St. 3d 160, 163, 450 N.E.2d 265 (1983). Moreover, a prosecutor's reference during closing argument to uncontradicted evidence "is not a comment on the accused's failure to testify where the comment is directed to the strength of the state's evidence and not to the silence of the accused, and the jury is instructed not to consider the accused's failure to testify for any purpose." *Id*.

{¶43} In this case, the trial court instructed the jury not to consider appellant's failure to testify for any purpose. (Tr. 875-876). Thus, it was permissible for the prosecutor to comment on the uncontroverted evidence that appellant denied knowing Ben Marsh, denied ever being at the Marsh house, and denied knowing where Canfield was located yet his fingerprints were found at the Marsh house. The prosecutor was simply commenting on the strength of the state's case and was not commenting on appellant's decision not to testify. Therefore, the prosecutor's comments here did not constitute plain error.

{¶44} Next, appellant takes issue with the prosecutor's questioning of Chappell as follows. Chappell testified that he performed testing on projectiles

recovered from the Marshes' bodies. (Tr. 544). The prosecutor then asked: "What are you able to say about those -- besides being from the .38 caliber classification, about those two bullets you were able to identify?" (Tr. 544). Once again, appellant did not object. Appellant asserts that prior to this question, there had been no testimony regarding the classification of the bullets and, therefore, the state was attempting to put facts into evidence that were not testified to.

**{¶45}** While Chappell had not yet testified that the bullets were all from a .38 classification, Chappell's report had been identified for the jury and the prosecutor had asked Chappell some questions regarding his report. (Tr. 539-540; State Ex. 45). And Chappell's report concluded that the four bullets he analyzed were "determined to be a .38 caliber class (.38 Special, .357 magnum, .38 S&W, .38 Colt New police) lead bullet exhibiting six (6) lands and grooves with a left direction of twist." (State Ex. 45). Chappell's report was admitted into evidence. (Tr. 750). Thus, when the prosecutor asked Chappell the above quoted question, she was simply referencing his report which had already been introduced and was ultimately admitted. Therefore, her question did not constitute plain error.

**{¶46}** Appellant next takes issue with the prosecutor's continued questioning of Chappell as follows:

> A    Based on the general rifling characteristics, the class characteristics that I mentioned earlier, I entered those into the database that's maintained by the FBI, and was able to provide a list of firearms that have those same general characteristics, and therefore could have fired those bullets.
>
> Q    What kind of characteristics did you find? Did you find the lands and grooves that we've talked about?
>
> A    The characteristics that I'm using for this search are the caliber family, the number of lands and grooves, their direction of twist, and the widths of the lands and grooves.
>
> Q    Do you know how many lands and grooves were on these?

A      There were six.

Q      Do you know the direction of twist?

A      Left.

Q      And that information you put into your database?

A      Yes, I did.

Q      And what did you come up with?

A      I came up with a list of possible firearms.

Q      And you're also included that in your report; is that right?

A      Yes, I did.

Q      Does your conclusion include weapons that are considered or called .38 specials?

A      Yes, it does.

Q      Out of the 12 guns you've listed, how many of those guns are .38 specials?

A      Eight.

(Tr. 544-545). On redirect, the prosecutor then asked:

Q      Mr. Chappell, you talked about matching two bullets to that list of guns, and eight of the twelve are .38 specials. Which two bullets have you identified that matched the .38 specials?

A      One - - I didn't identify any to a particular firearm.

(Tr. 547). Appellant asserts that this was an attempt to mislead the jury.

{¶47} The prosecutor did ask Chappell which two bullets matched .38 specials, which was an incorrect characterization of the evidence. There was no evidence that two of the bullets matched .38 specials. There was only evidence that two of the bullets matched each other and that all of the bullets were fired from a .38 caliber weapon. But Chappell immediately corrected the prosecutor's mischaracterization by stating that he did not identify any of the bullets to a particular

firearm. Therefore, appellant did not suffer any prejudice from the prosecutor's question and no plain error resulted.

{¶48} Next, appellant asserts that the prosecutor further attempted to mislead the jury in closing arguments:

> Because that person's dead, we have to have them [the bullets] reanalyzed. And the lead's been knocking around. They talked about the lead being soft. And all he could say - - he's honest. We want to represent that to you. Only two he can say matched now that are consistent from the same weapon. But the other two, they're not from a .45 and a .40. He can say that they're from .38s as well. He can still say that.

(Tr. 862). Appellant contends this statement is simply untrue and was calculated to mislead the jury into believing the bullets recovered from Ben's and Marilyn's bodies matched one .38 special.

{¶49} Appellant argues that the prosecutor misled the jury to believe that the bullets in this case came from a .38 caliber firearm. He contends this was highly prejudicial given his alleged statement to Deputy Fitzpatrick that a .38 special was his weapon of choice.

{¶50} Chappell's ballistics analysis clearly concluded the four projectiles recovered from Ben and Marilyn Marsh's bodies were .38 caliber ammunition. (Tr. 545; State Ex. 45). His report also listed the 12 possible types of firearms from which this .38 caliber ammunition was fired. (Tr. 545; State Ex. 45). Eight of the 12 listed firearms are .38 specials. (Tr. 545; State Ex. 45). The other four listed firearms are a .357 magnum, two .38 S&Ws, and a .38 colt new police. (State Ex. 45).

{¶51} The prosecutor's above-quoted statement was an accurate representation of the evidence. Chappell's report concluded that the four bullets he examined were all from the .38 caliber class. (State Ex. 45).

{¶52} Finally, appellant contends the prosecutor's statement that Frank Boyle

testified the Marsh garage had a Genie garage door opener, used to open and close the garage door after the murders (Tr. 822), was not found anywhere in Boyle's testimony.

{¶53} Boyle was a family friend of the Marshes and worked with Ben Marsh at General Motors (GM). He, along with Ben's father, discovered their bodies after the murders. Boyle testified that the GM plant supervisor called him when Ben did not show up for his shift at work. (Tr. 342). Boyle then went to the Marsh house to check on Ben. (Tr. 342). He testified that when he arrived the garage door was closed. (Tr. 344). Boyle stated that he and Ben's father had to remove the front screen door, which was locked, to gain access to the front door for which Ben's father had a key. (Tr. 345). Boyle also testified that the Marshes owned a truck and a car. (Tr. 349). He stated that when he arrived the truck was in the garage but the car was not. (Tr. 349). The car was later found abandoned in a K-Mart parking lot. (Tr. 408-409).

{¶54} Given this testimony, it was reasonable to infer that the person who killed the Marshes left in the family's car and closed the garage door with an electronic garage door opener as he left. Therefore, while the prosecutor's statement that Boyle testified the Marsh garage had a Genie garage door opener was incorrect, it was a reasonable inference to be drawn from the evidence. Moreover, the statement was not prejudicial in any way.

{¶55} Accordingly, appellant's third assignment of error is without merit.

{¶56} Appellant's fourth assignment of error states:

APPELLANT'S CONVICTIONS FOR THREE COUNTS OF AGGRAVATED MURDER WERE BASED UPON INSUFFICIENT EVIDENCE.

{¶57} Appellant urges that his convictions were not supported by sufficient evidence. He contends the fingerprint evidence and ballistics evidence did not prove that he murdered the Marsh family. He notes there was no evidence inside of the house linking him to the murders.

{¶58} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In essence, sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113.

{¶59} The jury convicted appellant of three counts of aggravated murder in violation of R.C. 2903.01(B)(C), which provides:

(B) No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

(C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense.

{¶60} There was no question in this case that the Marsh family was murdered when an intruder broke into their home. Deputy Coroner Dr. Joseph Orr testified that Ben's, Marilyn's, and Heather's deaths were all homicides. (Tr. 512, 517, 521). The only question was whether the evidence proved that appellant was the person who murdered them. The state put forth the following evidence.

{¶61} Finamore was the only witness to testify who was at the murder scene. Given that almost 40 years had passed from the time of the murders to the time of the trial, many of those involved in the initial investigation had passed away or were

unavailable. Finamore testified that when he arrived at the scene he saw Marilyn Marsh's body on the floor leading from the foyer into the kitchen. (Tr. 377). He saw Heather Marsh's body in the foyer. (Tr. 377). He saw Ben Marsh's body in the bedroom. (Tr. 378).

**{¶62}** Finamore testified that at the time there was snow on the ground. (Tr. 382). He observed one set of footprints that led from the driveway to the back of the house to the garage man door. (Tr. 382-383). The man door had three panes of glass and the bottom pane, above the lock, was broken out so that it appeared the intruder had reached in and opened the door. (Tr. 383). Finamore testified there were also two doors leading from the garage into the house, a storm door and a wooden door. (Tr. 381). The storm door was ajar and the wooden door had a boot print on it and appeared to have been kicked in. (Tr. 381-382).

**{¶63}** Finamore stated that in addition to the numerous sheriff deputies on the scene, BCI Agent Bernie Albert responded. Finamore assisted Albert in processing the scene. (Tr. 391). He observed and assisted Albert as Albert dusted for fingerprints and lifted latent prints from several places in the house. (Tr. 394-399; State Exs. 43A, B, C, D). This included observing Albert dust for and lift the fingerprints on the garage man door. (Tr. 399-400).

**{¶64}** Finamore testified that no weapons were found, nothing appeared to be missing, and the house did not appear to be ransacked. (Tr. 410). He further testified that while the Marsh family owned two vehicles, only one was found in their garage. (Tr. 407). The family's Chevy Vega was not there. (Tr. 407-408). Finamore stated that the Vega was later located in a K-Mart parking lot in Austintown. (Tr. 408-409).

**{¶65}** Andrew Chappell, the BCI firearms forensic scientist, testified next. Chappell testified that he examined four bullets in this case that were recovered from the bodies. (Tr. 542, 543). He concluded that all four bullets had the same general rifling characteristics and two of the bullets had matching individual barrel engraved striations, meaning those two were fired from the same firearm. (Tr. 542). The other

two bullets did not have sufficient detail in order to identify or eliminate them as having been fired from the same firearm as the others. (Tr. 542). However, he was able to say that they were from the same class of bullets. (Tr. 549-560). Chappell stated that he looked at the caliber family, the number of lands and grooves, their direction of twist, and the widths of the lands and grooves. (Tr. 544-545). With this information, Chappell was able to come up with a list of 12 possible firearms that fired these bullets. (Tr. 544-545). All of the possible weapons were .38 caliber weapons. (State Ex. 45). Eight of the 12 were .38 specials. (Tr. 545; State Ex. 45).

{¶66} Chappell further testified that lead is very soft and, over time, the lead wears down and becomes smoother, making it more difficult to make an identification. (Tr. 543). He acknowledged that in 1974 six bullets were submitted and, according to the case notes, were matched to each other. (Tr. 548). But he stated he did not know whether they had the capability back then to make a list of potential weapons that the bullets were fired from. (Tr. 548-549). Chappell stated that he reached his conclusions based on a reasonable degree of scientific certainty. (Tr. 549).

{¶67} On cross examination, Chappell again stated that he was only able to conclude that two bullets were fired from the same weapon. (Tr. 552). Thus, he agreed that, at most, the four bullets were fired from three weapons. (Tr. 552).

{¶68} Robin Ladd is a forensic scientist at BCI's latent print division. She testified that a person's fingerprints are permanent and unique for each individual so no two people have the same fingerprints. (Tr. 566-567). Ladd testified that BCI now has access to a database called the Automated Fingerprint Identification System. (Tr. 570). AFIS is a database of known finger and palm prints. (Tr. 570). AFIS was not available in the 1970's. (Tr. 570). The technology was not available until the late 1980's. (Tr. 570). Ladd testified that AFIS helps her identify prints that she would not have been able to identify years ago. (Tr. 571).

{¶69} Ladd testified that in reviewing the Marsh case file, she came across numerous latent fingerprint lifts. (Tr. 573). She identified some of the latent prints as

belonging to Ben Marsh. (Tr. 573-574). She then entered three fingerprints that were of sufficient quality into the AFIS database. (Tr. 574). Ladd stated that AFIS returned three "hits." (Tr. 574). She testified that the three prints that generated the AFIS hits were lifted from the "door of the garage." (Tr. 576; State Ex. 43A). AFIS identified the three prints as belonging to the left middle, left ring, and left little finger of appellant. (Tr. 576).

**{¶70}** Ladd testified that the three prints identified as appellant's were "very good quality" with very clear ridge detail. (Tr. 579). Once AFIS returned the hits, Ladd obtained appellant's fingerprint card so that she could make a comparison. (Tr. 580). Ladd testified that she compared appellant's known fingerprints to those lifted from the scene and confirmed that the prints at the scene were made by appellant's left middle, left ring, and left little fingers. (Tr. 582). She also testified that another fingerprint analyst independently verified that the three prints belonged to appellant. (Tr. 580-582).

**{¶71}** Deputy Devin Fitzpatrick testified next. Deputy Fitzpatrick works at the county jail. He testified regarding a conversation he had with appellant on October 7, 2013. Deputy Fitzpatrick stated that appellant approached him and asked him about his performance at the firing range. (Tr. 637). The two then got into a discussion about military experience and the skill levels of marksmanship in the military. (Tr. 637). They also discussed the pros and cons of semiautomatic pistols and revolvers. (Tr. 638). Deputy Fitzpatrick explained to the jury that a semiautomatic pistol automatically chambers the round once the trigger is squeezed whereas on a revolver, when you squeeze the trigger the chamber turns. (Tr. 638). He further explained that with a semiautomatic the casings are discharged out of the side of the firearm but with a revolver the casings remain in the firearm. (Tr. 638).

**{¶72}** Deputy Fitzpatrick testified that during his conversation with appellant, appellant asked him, "Do you know what my weapon of choice is?" (Tr. 638). He stated appellant then continued by answering his own question, "A .38 detective special." (Tr. 638). Appellant told Deputy Fitzpatrick the reason for this was, "No

brass. No brass" and "You're not gonna get any ballistics off of brass." (Tr. 638-639). Deputy Fitzpatrick explained that "brass" is the cartridge that is discharged from a semiautomatic or is maintained in a revolver. (Tr. 639). Finally, he testified that a .38 detective special was a revolver. (Tr. 638).

**{¶73}** Detective Patrick Mondora was the next witness. He stated that he began looking into the Marsh case in 2009. (Tr. 652). He contacted Ladd at BCI to see if BCI had any of the evidence from the case. (Tr. 656). Detective Mondora stated that Ladd got back to him regarding latent prints lifted from the Marsh crime scene. (Tr. 657). Ladd also provided Detective Mondora with appellant's name. (Tr. 657). This sparked Detective Mondora's investigation into appellant's background. (Tr. 657, 660). Detective Mondora stated that he spoke to appellant on February 11, 2010. (Tr. 661). Appellant told Detective Mondora that he worked at General Motors from 1970 until 1983. (Tr. 662). Through reading reports, Detective Mondora learned that Ben Marsh also worked at General Motors up until his death. (Tr. 662). Appellant also told Detective Mondora that he lived in Trumbull County in 1974, and moved to Austintown in 1976. (Tr. 662).

**{¶74}** Detective Mondora asked appellant if he knew Ben Marsh. (Tr. 664). Appellant stated twice that he did not know him. (Tr. 664). Appellant told Detective Mondora that he did not know Ben Marsh, he was not friends with Ben Marsh, he did not talk to Ben Marsh, he did not know where Ben Marsh lived, and he did not know where Ben Marsh's house was. (Tr. 664). Detective Mondora stated that at one point appellant asked "Where is Canfield?" and when the detective told him appellant again said that he did not know where the Marsh house was. (Tr. 664). Appellant also told Detective Mondora that he had never been to the Marsh house. (Tr. 664-665).

**{¶75}** Detective Mondora further testified he told appellant that his fingerprints were found at the crime scene. (Tr. 666). Appellant told him that was impossible because he did not know Ben Marsh. (Tr. 666).

**{¶76}** This case depends almost completely on the fingerprint evidence. The

evidence was uncontroverted that appellant's left middle, left ring, and left little fingerprints were found on the Marshes' garage man door near the broken pane of glass. Appellant denied knowing the Marshes, denied ever having been to their house, and denied even knowing where Canfield was. Yet three of his fingerprints were found on the Marshes' door near a broken pane of glass that was used to gain entrance into their house where they were murdered.

**{¶77}** The Ohio Supreme Court addressed the sufficiency of fingerprint evidence when there is little or no other evidence to support a conviction:

> In determining the sufficiency of the fingerprint evidence, a reviewing court must examine this evidence on a case-by-case basis. The crucial issue is whether attendant circumstances, such as the location of the accused's alleged fingerprint, the character of the premises where the print was found, and the accessibility of the general public to the object on which the print was impressed are sufficient to justify the trier of fact to conclude not only that the accused was at the scene of the crime when it was committed, but also that the accused was the criminal agent.

*State v. Miller*, 49 Ohio St. 2d 198, 202-203, 361 N.E.2d 419 (1977), vacated on other grounds in *Miller v Ohio*, 438 U.S. 911, 98 S. Ct. 3136, 57 L. Ed. 2d 1156 (1978).

**{¶78}** The Court went on to hold:

> Fingerprints corresponding to those of the accused are sufficient proof of this identity to sustain his conviction, where the circumstances show that such prints, found at the scene of the crime, could only have been impressed at the time of the commission of the crime.

*Id.* at the syllabus. The Court later reaffirmed its holding in *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991).

**{¶79}** Other courts have applied *Miller's* holding in upholding convictions based on fingerprint evidence.

**{¶80}** For instance, in *State v. Braxton*, 10th Dist. No. 84AP-924, 1985 WL 10312 (June 6, 1985), the court upheld the defendant's burglary conviction when the only evidence that placed the defendant at the scene of the crime were his fingerprints that were found on the broken glass of the door of entry. The court noted that the defendant's fingerprints were on both sides of the broken piece of glass. *Id.* at *1. It concluded that the only reasonable inference was that the defendant left the fingerprints there while gaining entry after breaking the glass. *Id.* The court also concluded that it was reasonable to infer from the fingerprints that the defendant entered the house and took the property that was reported missing. *Id.*

**{¶81}** In *State v. Braswell,* 6th Dist. No. L-08-1405, 2009-Ohio-4060, ¶7, the only evidence at the scene of the burglary was that an exterior screen to a bedroom window had been cut out and police found latent fingerprints on the inside of the window glass at the bottom and side of the window. The prints matched fingerprints taken from the middle and ring fingers of the defendant's left hand. *Id.* The victim testified that he did not know the defendant and had never given the defendant access to the apartment. *Id.* at ¶15. In examining a sufficiency challenge, the court determined that a rational trier of fact could conclude that the fingerprints were located on the window directly related to the crime, that being the window used by the burglar to gain entry to the apartment. *Id.* at ¶17. The court also noted that the fingerprints were located on the interior surface of the window. *Id.* It found that the facts excluded any innocent means by which the defendant's fingerprints could have been placed on the window. *Id.*

**{¶82}** And in *State v. Thomas*, 2d Dist. No. 14289, 1994 WL 527658, *1 (Sept. 28, 1994), the only evidence that linked the defendant to the scene of the burglary was his fingerprints found on a window screen from the residence that was found outside, but close to, the residence. The Second District concluded:

[R]easonable minds could conclude beyond a reasonable doubt that

the appellant's fingerprints could only have been placed on the window screen during the weekend the owners of the house were out of town and when the burglary occurred. The window screen was obviously removed in order to gain entrance to or exit from the house and the screen was found on private property not normally accessible to the public. No other explanation for the fingerprints being found on the window screen is demonstrated on this record. The jury could certainly reasonably infer that the appellant was at the scene of the crime when the crime occurred and conclude that he was the perpetrator of the crime.

*Id.* at *2.

**{¶83}** Based on the above case law, the fingerprint evidence in this case, coupled with appellant's statements that he did not know the Marshes and had never been to their house, was sufficient evidence for the jury to conclude that appellant was the one who broke into the Marshes' house and murdered them. The fingerprints were found on the garage man door of a private residence near a broken pane of glass that was used to gain access to the house where the Marshes were found murdered. And appellant's statements that he did not know the Marshes, had never been to their house, and did not know where Canfield was, removed the possibility that his fingerprints were left on the door from a social visit or other purpose. Additionally, the jury had the evidence before them that the weapon used was a .38 caliber weapon and appellant's "weapon of choice" was a .38 detective special. Construing this evidence in the light most favorable to the state, as we are required to do, sufficient evidence exists to support appellant's conviction.

**{¶84}** Accordingly, appellant's fourth assignment of error is without merit.

**{¶85}** Appellant's fifth assignment of error states:

APPELLANT'S CONVICTIONS FOR THREE COUNTS OF AGGRAVATED MURDER WERE AGAINST THE MANIFEST WEIGHT

OF THE EVIDENCE.

**{¶86}** Appellant next argues that his convictions were against the manifest weight of the evidence. He contends the fingerprint evidence should be given little weight because the state did not prove the chain of custody. Moreover, he argues the fact that he told Detective Mondora that he had never been to the Marsh home holds little weight given that the interview occurred 36 years after the murders. Appellant also points to evidence that a woman described a man she saw getting out of Marilyn Marsh's car in the K-Mart parking lot as being in his forties or fifties, but appellant was only 25 years old in 1974. Finally, appellant points out that none of the bullets recovered from the crime scene were matched to a specific kind of weapon.

**{¶87}** In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id*. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id*. at 390.

**{¶88}** Yet granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶ 49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, "[w]hen there exist two

fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99-CA-149, 2002-Ohio-1152.

**{¶89}** In addition to the evidence set out above, we must also consider the evidence appellant offered in his defense.

**{¶90}** Brenda Gerardi is a DNA laboratory supervisor at BCI. Gerardi compared appellant's DNA with DNA recovered from a cigarette found at the murder scene. (Tr. 768). She concluded that appellant was not a contributor to the DNA on the cigarette recovered from inside the Marsh house. (Tr. 769).

**{¶91}** Additionally, Detective Mondora testified on cross examination that according to the case file, an anonymous informer saw someone possibly getting out of the Marshes' vehicle in the K-Mart parking lot. (Tr. 689-690). The informer described the person as being in his mid-forties to fifties. (Tr. 730). Detective Mondora agreed that appellant would have been 25 in 1974. (Tr. 730).

**{¶92}** The jury's verdict was not against the manifest weight of the evidence.

**{¶93}** The most compelling evidence was that three of appellant's fingerprints were located on the Marshes' garage man door near the broken pane of glass that was used to gain entrance into their house. There was nothing to refute this evidence. The AFIS database identified all three prints as belonging to appellant. Robin Ladd conducted an examination of the fingerprints and concluded they all belonged to appellant. Ladd also stated that the three fingerprints lifted from the scene were of good quality. And Ladd's conclusions were independently reviewed and confirmed by another fingerprint analyst.

**{¶94}** Appellant testified that he did not know the Marshes and had never been to the Marsh house. Thus, there was no possibility that he may have left his fingerprints there on another occasion while visiting. The jury's only logical conclusion was that appellant left his fingerprints on the door when he broke into the Marsh house.

**{¶95}** Additionally, as discussed in appellant's first assignment of error, the

state established the chain of custody for the fingerprints. Finamore, who observed and assisted Albert in lifting the latent prints, identified the prints. And Ladd indicated that the fingerprint evidence had been in secure storage at BCI since the 1970's.

{¶96} Moreover, even though there was testimony that an anonymous informer described a man in the K-Mart parking lot as being in his forties or fifties, this evidence does not have much weight in exonerating appellant. The informer was anonymous and stated that the person was "possibly" getting out of the Marshes' car. Once the car was abandoned in the K-Mart parking lot, any passerby could have appeared to have been "possibly" getting out of the car.

{¶97} And even though appellant's DNA was not found on the cigarette at the scene, this does not exonerate him either. It simply means his DNA was not on the cigarette.

{¶98} Given the evidence in this case, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice. The fingerprint evidence was simply too strong and was not rebutted. This evidence coupled with appellant's statements that he did not know the Marshes, had never been to their house, and did not even know where Canfield was supported the jury's verdict. Therefore, the jury's verdict was not against the manifest weight of the evidence.

{¶99} Accordingly, appellant's fifth assignment of error is without merit.

{¶100} Appellant's sixth assignment of error states:

DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO EVIDENCE REGARDING THE 1976 BALLISTIC TEST RESULTS AND TO THE MISCHARACTERIZATION BY THE STATE OF THE 2010 BALLISTICS TEST RESULTS. APPELLANT WAS PREJUDICED BY COUNSEL'S DEFICIENT PERFORMANCE SUCH THAT HE WAS DEPRIVED A FAIR TRIAL.

{¶101} In his final assignment of error, appellant maintains that his counsel was ineffective. Appellant asserts counsel's failure to object to Chappell's and

Detective Mondora's testimony regarding the 1976 ballistics testing fell below the standard of reasonableness because the testimony was hearsay on hearsay, lacked a proper foundation, and violated his right to confront witnesses. He also argues counsel was ineffective for failing to object to the prosecutor's statements in closing arguments that assumed the bullets came from a .38 caliber weapon when this was not evidence. Appellant maintains that but for counsel's errors, the result of the trial would have been different because the only other evidence of his guilt was the fingerprint evidence.

{¶102} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. *Id.* To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus.

{¶103} Appellant bears the burden of proof on the issue of counsel's effectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In Ohio, a licensed attorney is presumed competent. *Id.*

{¶104} We have already discussed the issues appellant now raises. As discussed above, Chappell's and Detective Mondora's testimony regarding the 1976 ballistics testing did not violate appellant's right to confront witnesses and was not hearsay. Additionally, the prosecutor's statements in closing arguments telling the jury that the bullets recovered from the murder came from a .38 caliber weapon were supported by State's Exhibit 45, the ballistics report issued by Chappell. Thus, any objection by defense counsel on these issues would not have changed the outcome of the trial. Therefore, we cannot conclude defense counsel was ineffective.

{¶105} Accordingly, appellant's sixth assignment of error is without merit.

{¶106} For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

DeGenaro, J., concurs.